*662 OPINION OF THE COURT
James C. Tormey III, J.
Petitioner has presented an order to show cause and a summons and complaint challenging certain determinations of the representatives of the Village of East Syracuse. Petitioner is licensed by the Department of Environmental Conservation (DEC) pursuant to ECL article 27, title 15 and Public Health Law title XIII to transport, handle, transfer, collect and store regulated medical wastes (hereinafter RMW). The respondent does not take exception to the petitioner’s past RMW operation. The controversy before the court involves petitioner’s proposed expansion of it°s business to include the treatment and decontamination of RMW through the use of a commercially manufactured microwave.
EnviroTech sought and secured a license from New York State in 1992, as required by ECL article 27, title 15; Public Health Law title XIII; 6 NYCRR part 360 and 10 NYCRR part 70. In accordance with the prior license, EnviroTech "collects RMW from several small hospitals and numerous small generators such as doctors’ and dentists’ offices, funeral homes and veterinary clinics using a fleet of small straight-body trucks, consolidating the collected RMW at its East Syracuse transfer station onto highway van trailers for removal by another permitted transporter to a contracted out-of-state medical waste incinerator.” The pertinent regulations require, during the initial phase, that the applicant submit a State Environmental Quality Review (SEQR) statement which is reviewed by the lead agencies DEC and the Department of Health (DOH). The SEQR application must address, in part, an engineering feasibility study, plans, a description of the operation, testing and monitoring programs, personnel and training schedules, waste control intentions, contingency and emergency arrangements, security, closure and financial assurances. During the application, the petitioner is obligated to notify the local officials, and advertise in newspapers, its intent to apply for a RMW license. The purpose of the notification is to solicit any comments by the municipality or public or provoke the intervention of a local municipality in the SEQR process. At oral argument, it was indicated that the Village did not comment or participate in the SEQR for the initial license to operate a storage and transfer station for RMW at Hartwell Avenue. The Village did not apply to become an "interested”, "concerned” or "lead” agency in this review. The SEQR was approved and DEC issued a license to EnviroTech for the *663 transportation, collection, storage and. transfer of RMW at its Hartwell Avenue facility. As part of its operational requirements, the petitioner had to placard its property with signs declaring it a "Regulated Medical Waste Transfer Station.” Both parties confirmed at oral argument that the property has been placarded, as required, and that the respondents have made no complaints concerning the use of said property up to the present time.
The zoning ordinance of the Village deems said property to be in a light industrial zone. As such, certain uses are tolerated within the confines of said zone during the time that EnviroTech’s initial operation commenced until December 11, 1995, to wit:
"ARTICLE VIII LIGHT INDUSTRIAL 1-1 DISTRICT
"Section 8-1 Use Regulations. In 1-1 Light Industrial Districts the following use regulations shall apply:
"a. Uses Permitted.
"1. All uses not otherwise prohibited by law * * *
"b. Uses Prohibited.
"1. All uses of land which, because of danger to the general public and for the purpose of protecting the health, safety, morals or the general welfare of the community, that may be noxious or injurious by reason of the production or emission of dust, smoke, refuse matter, odor, gas fumes, wire, vibration or because of danger to the general public due to hazards of fire and explosion, including those uses where explosives, combustible gases or flammable liquids are manufactured or stored, shall be permitted only upon special authorization of the Board of Appeals and only in conformance with the State Building Construction Code and Labor Law of the State of New York.”
In July 1995, petitioner submitted the present application to DEC "to modify its existing * * * Permit to obtain additional approval for the construction and operation of an RMW Treatment Facility, and also submits an application for a Part 201 Permit to construct and operate an associated process exhaust system.” EnviroTech proposed a
"microwave treatment unit [which] * * * will completely shred the medical waste into fragments of uniform size, submit the shredded material to a 30-minute treatment of steam injection and microwave irradiation which completely disinfects the medical waste, and when necessary will further shred the disinfected medical waste to render it unrecognizable. The *664 shredded and disinfected product will then be transported as ordinary commercial solid waste for landfill disposal.
"The microwave disinfection system proposed is relatively small, and will operate in the same building which currently houses the RMW Transfer Station. No additional floor space is required to incorporate the microwave disinfection unit. The disinfection system is environmentally benign, with no liquid discharges and minimal air emissions. Additionally, the resulting shredded and disinfected product consumes only one-third of its original volume, reducing demand on landfill capacity.”
On October 6, 1995, DEC and DOH issued final approval for the project and issued the necessary permits in accordance with the ECL and Public Health Law. The approval was for "a Microwave Disinfection Unit which will process up to 12 tons/ day of RMW.” The reviewing State agencies based their approval, in part, on specific findings, to wit:
"reasons for supporting this determination
"1. This is a modification to a DEC permitted Regulated Medical Waste (RMW Storage / Transfer Station Facility [sic] to treat the RMW coming in, so that only commercial garbage will leave the site. Thereby, lessening any possible negative travel impact by 50%.
"2. The NYS Department of Health has officially approved Microwaving as an 'Approved Alternate Treatment Method’ for RMW.
"3. The commercial garbage leaving the site will go to a permitted landfill: Seneca Meadows Landfill.
"4. All RMW will be handled inside the existing building (similar to how the current permit operates).
"5. A back-up disposal system will be implemented and their primary contingency plan used to revert to the operation of a RMW Transfer Station. The untreated RMW will be transported out of state to the Chambers Medical Technologies of South Carolina, Inc.
"6. The site does not lie near a NYS Protected Stream, or lie in a 100 year Floodplain or in a NYS Agricultural District, on or near an Archaeological / Cultural area or hazardous waste site, or over an aquifer; there are no endangered species of plants or animals on site.
"7. The site is partly surrounded by a Protected Freshwater Wetland — SYE 11. However, since no drainage is anticipated or permitted off-site, the wetland will not be affected.”
*665 To secure approval to modify its operating permit, EnviroTech had to provide local notification. On June 14, 1995, EnviroTech mailed to the Village of East Syracuse Fire Chief and Chief of Police separate, but identical letters. To summarize, the correspondence notified these officials that the petitioner was applying for a permit to modify the use of the facility "from a transfer facility to a transfer and treatment facility.” Further, "the amended permit would allow us to bring medical waste to our facility, treat the waste through a microwave disinfection system and transport the non-regulated solid waste to an ordinary landfill.” EnviroTech informed these officials that the purpose of the correspondence was "to acquaint [them] with the general operation of the proposed facility in the event of an emergency.” EnviroTech enclosed a copy of the operating plans, contingency plan, list of emergency coordinators’ phone numbers and a plan of the facility locating safety and emergency supplies and equipment. The letter invited the addressees to contact EnviroTech to review the information or to ask any questions. In addition, the petitioner provided notification of its permit application in two separate publications on August 28,1995. Further, on September 18,1995, the petitioner held a voluntary public informational meeting with the Village’s Board of Trustees. At the conclusion of this meeting, the Board made a request for:
"A. A guarantee from EnviroTech’s insurance carrier that the Village would be named as an additional insured, and would be notified in advance in case of any lapse in insurance;
"B. An outline of testing and monitoring procedures associated with microwave equipment operation; and
"C. A request for training of Village Fire and Police personnel as necessary and appropriate.”
Mr. Stanizone reports, without dispute from the Village, that he provided the above items to the Village on September 20, 1995.
EnviroTech was notified in a letter dated November 3, 1995,[1] that it would have to seek a special authorization of the Board of Appeals pursuant to article VIII, § 8-1 (b) (1) before it could proceed with this project. Simultaneously, the Village contemplated modifying its zoning ordinance by prohibiting all such waste in an 1-1 zone and allowing said wastes in a heavy *666 industrial zone by a special permit only. A public hearing was held on November 20, 1995 in which two comment letters were received — from EnviroTech and Bristol-Myers Squibb. Each protested the scope, intent and questionable drafting of the proposed modification. As a result, the local law was amended to its present form and targeted at solely an 1-1 zone. On December 11, 1995, immediately after the public hearing, the Village amended article VIII with Local Law No. 1 of 1995 which added section 8-1 (b) (4) "Uses Prohibited: The disposal, processing or storage of toxic wastes, medical or infectious wastes.”
ISSUE: IS THE STATE'S INTEREST IN REGULATION RMW
SUFFICIENTLY BROAD TO PREEMPT LOCAL INTERVENTION?
EnviroTech did not apply for a special permit. Petitioner asserts that it was not necessary due to the extensive review process by the State agencies with potential input of local authorities through SEQR. The Village responds that its previous zoning ordinance for a light industrial zone conditionally prohibited the treatment of medical wastes without a special permit and, after the adoption of Local Law No. 1, absolutely prohibited any operation concerning toxic, medical or infectious wastes.
The standards upon which this court relies to gouge whether the State activities have dominated the regulation of RMW rests upon the directives of Albany Area Bldrs. Assn. v Town of Guilderland (74 NY2d 372, 377 [1989]).
"The preemption doctrine represents a fundamental limitation on home rule powers (see, Dougal v County of Suffolk, 65 NY2d 668, affg on opn at 102 AD2d 531, 532; 5 McQuillin, Municipal Corporations § 15.20, at 101-104 [3d ed 1989]). While localities have been invested with substantial powers both by affirmative grant and by restriction on State powers in matters of local concern, the overriding limitation of the preemption doctrine embodies 'the untrammeled primacy of the Legislature to act * * * with respect to matters of State concern.’ (Wambat Realty Corp. v State of New York, 41 NY2d 490, 497.) Preemption applies both in cases of express conflict between local and State law and in cases where the State has evidenced its intent to occupy the field (see, e.g., Matter of Lansdown Entertainment Corp. v New York City Dept. of Consumer Affairs, 74 NY2d 761 [express conflict]; Consolidated Edision Co. v Town of Red Hook, 60 NY2d 99 [intent to occupy the field]).
*667 "When the State has preempted, the field, a local law regulating the same subject matter is deemed inconsistent with the State’s transcendent interest, whether or not the terms of the local law actually conflict with a State-wide statute. Such local laws, 'were they permitted to operate in a field preempted by State law, would tend to inhibit the operation of the State’s general law and thereby thwart the operation of the State’s overriding policy concerns.’ (Jancyn Mfg. Corp. v County of Suffolk, 71 NY2d 91, 97.) Moreover, the Legislature need not express its intent to preempt (New York State Club Assn. v City of New York, supra, at 217). That intent may be implied from the nature of the subject matter being regulated and the purpose and scope of the State legislative scheme, including the need for State-wide uniformity in a given area (see, Robin v Incorporated Vil. of Hempstead, 30 NY2d 347). A comprehensive, detailed statutory scheme, for example, may evidence an intent to preempt.”
Under chapter 431 of the Laws of 1987, the State adopted a statutory scheme to control and regulate medical wastes through the Department of Environmental Conservation and the Department of Health. The State amended the statutory framework in 1989 (L 1989, ch 180) and again in 1993 (L 1993, ch 438). Contained, in part, is the legislative intent that the program of RMW has had the desired effect of ensuring proper handling and disposal while reducing the incidence of unhealthy disposal; however, there is a continuing "need to review the universe of wastes captured under the regulated medical waste program.” (L 1993, ch 438, § 1 [emphasis added].)
Additionally, the court has reviewed the accompanying legislative correspondence in the Bill Jacket. Senator Johnson, a prime sponsor, wrote to then Governor Cuomo: "clearly, the time has come for New York State to do away with the previous patchwork approach to the handling, storage and disposal of infectious waste. This bill [citation omitted] accomplishes that goal without undue hardship or expense to the industry.” (Letter dated July 21, 1987, Bill Jacket, L 1987, ch 431.) Janice Corr, Deputy Commissioner and General Counsel for DEC, informed the Senate by memorandum dated August 5, 1987:
"This bill would provide for the regulation of the storage, treatment and disposal of biohazardous infectious waste. Past experience in this field has demonstrated an obvious need for improved controls over all aspects of biohazardous waste handling.
*668 "Under this bill, the storage, handling and disposal of bio-hazardous infectious waste, on site of the generator of such waste such as hospitals, clinics, labs veterinary facilities and doctors’ offices, will continue to be regulated by the Department of Health (DOH) pursuant to the Public Health Law. Once the material leaves the site of its production, its transport, storage and eventual disposal will be regulated by the Department of Environmental Conservation (DEC).” (Bill Jacket, L 1987, ch 431.)
Finally the court is impressed by the Governor’s statement dated June 22, 1989, as to why he signed into law chapter 180 of the Laws of 1989:
"This bill, which is part of my 1989 Legislative Program, creates a comprehensive system for the effective regulation and tracking of regulated medical waste. The bill parallels the federal regulatory system created in the Medical Waste Tracking Act of 1988 (MWTA) but provides even greater protection to the people of this State against the mishandling of regulated medical waste.
"The need for stringent regulation of medical waste has been dramatically demonstrated by the continuing problem of such wastes in the waters and on the beaches of the State * * *
"This bill recognizes the need for uniform and comprehensive State management in this area. Importantly this bill provides for truly effective and enforceable sanctions that are essential to deterring conduct that threatens the safety and economic well being of the State.” (Governor’s Mem approving L 1989, ch 180, 1989 McKinney’s Sessions Laws of NY, at 2393-2394.)
As a result of legislative action a whole statutory framework has been enacted. Currently, ECL article 27, title 15 encompasses the "Storage, Treatment, Disposal and Transportation of Regulated Medical Wastes”. (See also, Public Health Law §§ 1389-aa, 1389-c.) Included are RMW laws which provide for a tracking program (ECL 27-1504), standards for storage and containment (ECL 27-1505, 27-1517), treatment and disposal (ECL 27-1507, 27-1513, 27-1517), transfer to off-site treatment and disposal (ECL 27-1509), regulation of generators and transporters of RMW (ECL 27-1510, 27-1511, 27-1517), together with civil and criminal sanctions (ECL 71-4400 — 71-4412). Pursuant to the legislative directives per ECL 27-1515, DEC and DOH have adopted a comprehensive regulatory framework (6 NYCRR part 360; 10 NYCRR part 70) to control RMW from its genesis until rendered an inert common refuse through treatment.
*669 Of particular interest. concerning the issues herein is ECL 27-1503. This section contains three elements. First is to regulate the transportation of RMW in a uniform manner throughout the State. Second, any person involved in any phase of RMW shall conform their operation to the requirements of title 15. Third is that title 15 and its regulations shall supersede all other State and local laws relating to the transportation of RMW. Of critical importance to the scope of this superseder statute is the meaning of transportation. The Legislature provided an expansive definition of transportation, to wit, "the movement of regulated medical waste from the point of generation to any intermediate points and finally to the point of ultimate disposal.” (ECL 27-1501 [4].) This court construes the legislative intent by allowing these defining words to command their ordinary meaning. Transportation, within title 15 of ECL article 27, involves all stages of RMW from the point of its creation until its safe disposal. Any other meaning would cause gaps within the coverage of this statutory framework, would be in violation of the legislative intent to have the universe of these wastes handled in a uniform manner and would defeat regulatory safeguards to protect public safety.[2]
As a result of the above, the court determines that the State has evinced the necessary intent, either directly or implicitly, to exclusively regulate RMW. In accordance to the parameters of Albany Area Bldrs. Assn. v Town of Guilderland (supra), this court finds that the State has preempted local municipalities concerning the control of regulated medical wastes.
The respondents’ position is that after the petitioner has complied with ECL and has completed an extensive regulatory review, the petitioner must then seek a special permit from the local authority to operate a RMW facility. This, of course, is after the Village has ignored or waived its opportunity to be heard during the SEQR and permit application. The court is presented with two issues: does the Village have that authority, and does its zoning ordinance require a special permit in this instance.
From the above discussion the court has found that any power claimed by the Village in its zoning ordinance in regard to RMW has been preempted by the pertinent parts of ECL article 27. Therefore, it is the determination of this court that *670 the Village has no independent special review powers over RMW. In accordance with the court’s analysis, what specific authority has been reserved to the Village? During oral argument, the Village’s representatives presented no area or issue that the State regulations have not addressed or could not have addressed if the Village officials or public cared to participate in the permit process. The Village has not addressed how these local laws would provide for uniform handling and safeguards if each local authority reserved unto itself how the wastes were to be handled, or what was an appropriate transportation, storage or disposal method. The Village has not addressed what it would change and how the change would impact upon mandates in EnviroTech’s permit. After securing a permit within the statutory framework, the regulatory requirements, and agency oversight, what is left for the Village to review? On what rational basis could the Village modify or deny this permit? By its very nature, a requirement to obtain a special permit from the local municipality suggests that the Village could forbid, reject or modify that which has already been approved by the State. Such a concept would violate the cardinal tenet of preemption. (People v New York Trap Rock Corp., 57 NY2d 371, 378 [1982].)
The court notes that there is a distinct contrast between the extensive detail of the ECL and its regulations concerning RMW and the vagueness and lack of regulation underlying article VIII, § 8-1 (b) (1) that the Village relies upon. Accordingly, this contrast further reinforces the court’s determination that the State has preempted regulation of RMW and RMW facilities.
Secondly, the Village ordinance requires a special permit only where there is a danger to the general public and for the purpose of protecting the community by reason of production or emission of certain items or because of fire or explosion. There has been no showing on this record that this project will generate any emissions or cause a fire or explosion. The court is troubled by the vagueness and breadth of the possible applications of this ordinance. The Village provides no definition of the terms in the ordinance, no scope as to when it would apply, and no guidance upon which a person could reasonably anticipate when one would have to apply for a special permit. Rather, the SEQR process demonstrates the opposite. The court directs the Village’s attention to the findings of the State’s review agencies that, in pertinent part: (1) the product will be reduced to commercial garbage; (2) the process will lessen any *671 possible negative travel impact by 50%; (3) the treatment process has been previously approved by the Department of Health; (4) the disposal will be handled inside the existing building just as the present process occurs; and (5) as a contingency, the facility will revert to an RMW transfer site if the disposal mechanism becomes inoperative. Nowhere in the SEQR documents or the permit approval is there any suggestion that there is an increased danger to the public safety or that there will be any emissions enumerated in the ordinance. In fact, as stated above, the negative impact of the operation is reduced 50% from what the Village currently allows. Therefore, the court finds that the petitioner’s request to operate said RMW treatment facility does not fall within the purview of a special permit scope of review that is set forth in article VIII, § 8-1 (b) (1).
SUMMARY
The application of the petitioner requesting relief is hereby granted, in that the court finds that: (1) EnviroTech, once issued a RMW permit by the State regulatory agencies, had a right to modify the utilization of its property pursuant to its permit. Any attempt by the Village to thwart the exercise of that permit upon this record was arbitrary and capricious; (2) ECL article 27, title 15 supersedes the Village review powers under article VIII, § 8-1 (b) (1); (3) this decision does not relieve EnviroTech from the obligation of securing a building permit, if required by law.

. Attorney Temple’s letter was mailed seven weeks after petitioner’s informational meeting with the Village and four weeks after RMW treatment permit approval.

. In accordance with the above analysis, the court declines to follow Matter of Pete Drown, Inc. v Town Bd. (188 AD2d 850 [3d Dept 1992]).